IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| MARK S. SMITH,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>Respondent. | Case No. 1:25-cv-00016<br><br>**DECISION AND ORDER GRANTING IN PART HUD'S CROSS MOTION FOR SUMMARY JUDGMENT; AND GRANTING SMITH'S MOTION FOR SUMMARY JUDGMENT VACATING ADMINISTRATIVE ORDERS** |

## I. INTRODUCTION

This civil action arises under the Program Fraud Civil Remedies Act ("PFCRA") and is brought by Petitioner Mark Smith seeking judicial review of administrative orders issued by an Administrative Law Judge ("ALJ") with the United States Department of Housing and Urban Development ("HUD") Office of Hearings and Appeals ("OHA"), which were affirmed by the HUD Office of the Secretary, imposing civil penalties and assessments totaling $735,372 pursuant to the PFCRA for twenty-five (25) false or fraudulent claims submitted to HUD involving the Guam Housing and Urban Renewal Authority's ("GHURA") administration of the Section 8 Program. (*See generally* Pet., ECF No. 1; ALJ Dec., ECF No. 14-3; Sec. Rev. Order, ECF No. 14-2.) HUD established the Housing Choice Voucher Program, also known as the Section 8 Program, to provide public housing agencies ("PHAs") with federal funds to make housing assistance payments ("HAP payments") on behalf of tenants so they may rent "safe, decent, and sanitary housing." (ALJ Dec. 4 (citing 24 C.F.R. § 982.1(a)(1), 982.2, 982.201(a)–(b)).). GHURA is Guam's PHA—a "[s]tate, county, municipality, or other governmental entity or public body . . . which is authorized to engage in or assist in the development or operation of

public housing . . . ." 42 U.S.C. § 1437(a)(b)(6). Petitioner Mark Smith owned multiple rental properties and participated as a landlord in HUD's Section 8 Program before, during, and after his employment as legal counsel for GHURA.

Before the Court are Petitioner Mark Smith's motion for summary judgment and Respondent HUD's cross-motion for summary judgment, fully briefed.[1] Smith argues that the administrative orders were issued without jurisdiction because they exceeded the jurisdictional cap set out in the statute. (Pet. 2; Smith's MSJ 5, ECF No. 14; *see also* 31 U.S.C. § 3803(c) (2024).[2]) Smith also argues that the penalties and assessments imposed by the administrative order violated the Excessive Fines Clause of the Eighth Amendment, the Due Process Clause of the Fifth Amendment, and exceeded the maximum penalties established in the statute and regulation. (Pet. 2; Smith's MSJ 19–23.) Finally, Smith states the agency misinterpreted the regulation's conflict-of-interest language. (Smith's MSJ 5). In his Supplemental brief, he cites to the recent Supreme Court opinion in *Securities and Exchange Comm'n v. Jarkesy*, 603 U.S. 109 (2024), to support his claim "the administrative penalties imposed in this case violated [his] rights under the Seventh Amendment." (Suppl. 1, ECF No. 15.) In addition, Smith states that HUD "is attempting to enforce duplicative penalties against" him in the pending qui tam civil action in No. 1:15-cv-00040. (*Id.*) Accordingly, Smith seeks judicial review of the administrative

[1] Smith filed his motion for summary judgment (Smith's MSJ, ECF No. 14) and a Supplement to his Motion to Grant Petition for Review and for Summary Judgment (Suppl., ECF No. 15); HUD filed its response in opposition and cross-motion for summary judgment (HUD's MSJ, ECF No. 16), to which Smith replied both to the opposition and cross-motion (Smith's Reply, ECF No. 17). HUD timely filed its cross-reply (HUD's Reply, ECF No. 25).

[2] At the time the conduct occurred, between 2011 and 2014, and up until December 2024, the jurisdictional cap was $150,000. (Smith's MSJ 9–10.) On December 23, 2024, the limit was increased to $1,000,000, but such an amendment does not apply retroactively. (*Id.* at 10; 31 U.S.C. § 3803(c)(1); *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).) As such, the Court applies the $150,000 amount.

orders and, ultimately, vacatur of the orders in full or a reduction of the penalties imposed. (Pet. 3; Smith's MSJ 23.)

HUD, in its cross-motion, argues that this Court has no jurisdiction to review any objection Smith made in his motion or petition that he did not raise before the ALJ. (HUD's MSJ 7–8, ECF No. 16 (citing 31 U.S.C. § 3805(d)).) Further, HUD argues that the jurisdictional cap was not exceeded, that the agency's interpretation of the regulation was proper and correct, and that the penalties and assessments imposed are proper considering Smith's conduct. (*See generally id.*) In response to Smith's Supplement, HUD argues Smith filed his brief in violation of the local rules and therefore should not be considered, and Smith's failure to raise *Jarkesy* before HUD despite ample opportunities to do so strips this Court of jurisdiction to consider this argument under § 3805(d). HUD seeks a dismissal of Smith's petition for review. (*Id.* at 31.)

After considering the parties' briefs, exhibits, oral argument, and the applicable law, the Court now grants the Petition for review, grants HUD's cross-motion in part, and grants Petitioner Smith's motion based on *Jarkesy*. As a result, the Court will vacate the administrative orders against Smith in full for the following reasons.

## II. PROCEDURAL BACKGROUND

The United States has pursued civil, criminal, and administrative proceedings based on Smith's conduct. The only unresolved matter is the instant administrative case. A brief review of the various proceedings places much of the information in context.

On November 6, 2015, Relator Ray Sanchez Topasna—former Executive Director of GHURA—initiated a qui tam civil action under the False Claims Act ("FCA") against Mark S. Smith, GHURA, and its Board of Directors. ("Qui Tam Action," ECF No. 1 *in* No. 1:15-cv-00040.) The United States filed its Complaint in Intervention against Smith and Glenn D. Wong only on September 19, 2019. (ECF No. 55 *in* No. 1:15-cv-00040.) Eventually, both the United

States and Smith moved for summary judgment, which this Court recently decided in the United States' favor in part, awarding it $1.4 million for treble damages and civil penalties, and in Smith's favor in part, denying the United States' claim for the recovery of legal fees paid to Smith.[3] (ECF No. 148, *in* No. 1:15-cv-00040.)

On March 14, 2017, the United States filed federal criminal charges against Smith and co-defendant Wong. (ECF No. 1 *in* No. 1:17-cr-00020.) On December 21, 2022, this Court acquitted Smith of his jury convictions on all counts. (ECF No. 686 *in* No. 1:17-cr-00020.)

While both the Qui Tam Action and the criminal case were pending, HUD initiated an administrative case on July 17, 2017,[4] when HUD filed its first complaint against Smith in Case No. HUDOHA 17-JM-0135-PF-004, and subsequently an amended complaint, alleging Smith violated the PFCRA when he submitted five false claims through the Section 8 Program between September and December 2011. (ALJ Dec. 2; Sec. Rev. Order 7; 2017 HUD Amended Compl., ECF No. 14-4.) On February 28, 2018, HUD filed its Motion for Summary Judgment (HUD's MSJ), to which Smith responded (Respondent's Opp. *in* 17-JM-0135-PF-004), where he was represented by David Lujan. (Sec. Rev. Order 7.) On June 28, 2018, HUD filed its second complaint against Smith, as well as Glenn Wong, and his mother Rosita Owen in Case No. HUDOHA 18-JM-0208-PF-010, alleging additional violations of the PFCRA against them for 20 false claims submitted between August 2012 and May 2014. (*Id.*; ALJ Dec. 2–3.) These two actions were stayed during the criminal proceeding. (ALJ Dec. 2; Sec. Rev. Order 7.) After the

---

[3] Smith's argument about duplicative enforcement of penalties is well taken. In fact, the United States agreed to "offset any amount paid under the PFCRA judgment" against any award amount entered in the Qui Tam Action. (US' Opp'n 16 n.16, ECF No. 130 *in* No. 1:15-cv-00040.)

[4] Both the ALJ's Decision and Secretarial Review Order misstate the date of the complaint's submission as July 17, 2017. (ALJ Dec. 2; Sec. Rev. Order 7.) However, the complaint itself is dated July 21, 2017. (*See* Complaint *in* No. 17-JM-0135-PF-004.)

criminal action concluded, Administrative Law Judge J. Jeremiah Mahoney on November 15, 2024, entered a consolidated order as to both HUD's 2017 and 2018 complaints, finding Smith submitted 25 false and fraudulent claims and imposing assessments totaling $532,872 and civil penalties totaling $202,500, for a total penalty of $735,372 pursuant to the PFCRA. (ALJ Dec. 19.) On or about February 11, 2025, Secretarial Designee Andrew Hughes issued a final Order on Secretarial Review denying the appeal and affirming the ALJ's decision. (Sec. Rev. Order.) Smith submitted his petition for judicial review in the instant case on April 10, 2025. (Pet.)

## III. FACTUAL BACKGROUND

The facts below are derived from the ALJ's findings of fact which are undisputed, based on the parties' motions for summary judgment before the ALJ (ALJ Dec. 4–9; *see also* Sec. Rev. Order 3–7 (finding that the same facts were "not in dispute and not challenged by [Smith] in his Appeal"); Gov. MSJ 8–60, ECF No. 14-6 (submitted by Smith)), which are based on numerous declarations and exhibits submitted in the administrative proceeding (ECF No. 8).[5] Moreover, with respect to questions of fact, the agency's "decisions, findings, and determinations [are] final and conclusive, and shall not be set aside unless . . . unsupported by substantial evidence." 31 U.S.C. § 3805(c).

### A. Background on Section 8 Program and HAP contracts

Section 8 property owners, such as Smith, enter into lease agreements with a tenant under the Housing Choice Voucher ("HCV") Program (*see, e.g.*, HAP Contract 12, GOV #004). The property owners also enter into Housing Assistance Payment ("HAP") contracts with GHURA to receive HAP payments made by GHURA on behalf of tenants. (*See, e.g.*, *id.* at 1–10.) HAP

[5] The Clerk's Notice of Receipt of Administrative Record contains the link to the administrative record provided by HUD. (ECF No. 8.) For ease and clarity, the Court cites to the cross index of exhibit numbers ("CS Ex.") or Bates stamp ID on each record as applicable and as provided in the related case *United States ex rel. Topasna v. Smith*, No. 1:15-cv-00040, "Exhibit 1," ECF No. 122-1.

contracts contain a specific conflict of interest provision prohibiting "covered individuals" from having "any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such a person is a covered individual or during one year thereafter." (ALJ Dec. 5; Gov. MSJ ¶ 2; HAP Contract 6 ¶ 13.) As relevant to this case, a covered individual is defined as "a person or entity who is . . . [a]ny employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program[.]" (ALJ Dec. 5; Gov. MSJ ¶ 3; *see, e.g.*, HAP Contract 6 ¶ 13.a.) If a person is a covered individual, they are not eligible to become a Section 8 landlord, nor are they eligible to receive housing assistance payments under the HAP contract. (Gov. MSJ ¶ 4; HAP Contract 4 ¶ 7.b. ("Unless the owner has complied with all provisions of the HAP contract, the owner *does not have a right to receive* housing assistance payments under the HAP contract" (emphasis added)).) HUD regulations contain the same prohibition against covered individuals from entering into a contract in connection with the HCV program. (ALJ Dec. 4; Sec. Rev. Order 3; 24 C.F.R. § 982.161.) HAP contracts require owners to promptly and fully disclose any prohibited interests, should they occur, to both the PHA (here, GHURA) and HUD. (ALJ Dec. 4; Sec. Rev. Order 3; HAP Contract 6 ¶ 13.e.) The HAP contracts and HUD regulations contain waiver provisions: "[t]he conflict of interest prohibition under this section may be waived by the HUD field office for good cause." (HAP Contract 6 ¶ 13.f.; ALJ Dec. 4; Sec. Rev. Order 3; 24 C.F.R. § 982.161(c).)

**B. Smith's employment with GHURA and HAP contracts**

**1. Smith becomes a Section 8 landlord in 2004 and GHURA legal counsel in April 2011.**

From approximately May 2000 until May 2002, Smith served as principal legal counsel to GHURA. (Sec. Rev. Order 3; Gov. MSJ ¶ 26.) At that time, he was not a Section 8 landlord. (Gov. MSJ ¶ 26.) In June 2004, Smith became a landlord under the Section 8 Program. (*Id.*)

In March of 2011, GHURA issued a "Request for Proposal Legal Services" ("RFP"), soliciting proposals for legal services to replace Lujan's firm, then serving as GHURA's legal counsel. (ALJ Dec. 5; Sec. Rev. Order 3.) The RFP contained multiple sections describing conflicts of interest. (Sec. Rev. Order 3.) On March 11, 2011, Smith submitted an application, stating he "served as previous legal counsel for GHURA[,]" would "prioritize GHURA over all matters[,]" and "will be directly responsible for all matters involving GHURA." (Gov. MSJ ¶¶ 41–46.) As part of his application, Smith hand-delivered a letter to GHURA, certifying that "there is no conflict of interest with regard to [him] providing legal services to GHURA." (*Id.* at ¶ 49; ALJ Dec. 5; Sec. Rev. Order 3; COI Letter, GE 25.) Smith neither disclosed that he was a Section 8 landlord in his application nor notified any of those who interviewed him of this fact. (ALJ Dec. 5; Sec. Rev. Order 4.)

Later in March 2011, Smith and GHURA entered into a legal services contract, which described the duties Smith would perform for GHURA, including acting as counsel; preparing opinions, resolutions and reports "at the request of any member of the Board of Commissioners (BOC) or Executive Director or its designee"; undertaking legal research as "requested by the BOC of Executive Director or its designee"; advising the Board and Executive Director "of all legal matters to which [GHURA] is a party or in which [GHURA] is legally interested"; representing GHURA in litigation; reviewing and preparing contracts, leases, bid invitations, and other documents; providing "legal assistance and advice during any negotiations with [GHURA's] tenants and contractors"; and attending all Board meetings. (ALJ Dec. 5–6; Legal Services Contract 1–2, GE 28; Gov. MSJ ¶ 52.) GHURA's representative signed the fee agreement on March 18, 2011. (Legal Services Contract 4.) On April 28, 2011, GHURA's BOC approved Smith as GHURA counsel. (ALJ Dec. 6.) At around the same time that GHURA hired Smith, it also "contracted with a separate law firm as 'conflicts counsel,' but did not intend for

its conflicts counsel to handle Section 8 matters or to be used to screen [Smith] from any particular Section 8 matters." (Sec. Rev. Order 4.)

**2. GHURA management discovers its legal counsel, Smith, is a Section 8 landlord**

On July 14, 2011, GHURA's Section 8 Administrator informed GHURA's executive management that Smith was a landlord under the Section 8 Program. (ALJ Dec. 6; Gov. MSJ ¶ 70–71.) The same day, GHURA's Section 8 Administrator sent an email to management titled "Conflict of Interest" stating:

> I need to let you know that our new attorney, Mark Smith is a landlord under the Section 8 program, which is a direct conflict of interest. Mr. Smith must disclose his interest. Please be advise[d] that we would have to terminate any existing contracts with Mr. Smith unless his participation is approved by HUD.

(Gov. MSJ ¶ 72.) This email was forwarded to Smith for review. (*Id.* at ¶ 74; ALJ Dec. 6.) The Executive Director also spoke to Smith about the conflict and told him to review HUD's actions regarding David Lujan's request for a conflict waiver. (ALJ Dec. 6; Gov. MSJ ¶ 75; Sec. Rev. Order 4.) During this conversation with the Executive Director, Smith did not indicate he believed a conflict did not exist or that the Executive Director was wrong; rather, Smith informed GHURA he would transfer his ownership interests in the property. (ALJ Dec. 6.; Gov. MSJ ¶ 77.)

Between September 1, 2011, and December 1, 2011, as an owner of thirteen properties in the Section 8 Program administered by GHURA, and while serving as GHURA's legal counsel, Smith received five HAP payments totaling $48,140 from GHURA. (ALJ Dec. 7; Sec. Rev. Order 5.)

**3. Smith's work as GHURA's legal counsel.**

As GHURA's legal counsel, Smith, among other things, provided legal opinions to GHURA's BOC and executive management, reviewed and analyzed GHURA's Section 8

Administrative Plan, and billed GHURA for work regarding the Section 8 Program. (ALJ Dec. 6; Gov. MSJ ¶¶ 59–69; Sec. Rev. Order 4.) During the time period when he was directly receiving HAP payments into his personal account—between September and December 2011—Smith billed GHURA for research, analysis, and drafting of a memorandum regarding the Section 8 Program. (*See* ALJ Dec. 6; Gov. MSJ ¶ 64; Smith's Billing Records 1, GE 97.)

Further, Smith proposed revisions to GHURA's conflict-of-interest disclosure form, revisions which were ultimately accepted by the BOC. In January 2012, GHURA's BOC Chairman asked Smith to review the conflict-of-interest disclosure form, which was used by GHURA to disclose all conflicts of interest, including those relevant to the Section 8 Program. (ALJ Dec. 6; Gov. MSJ ¶ 66.) At a BOC meeting on February 12, 2012, Smith discussed his proposed changes, noting the language was broad enough to cover both direct and indirect interests and that step- and half-sibling relationships would be covered. (Gov. MSJ ¶ 6; BOC Transcript Feb. 21, 2012 2–5, GE 26b2.) The Board approved the new conflict-of-interest disclosure form, as revised by Smith. (ALJ Dec. 6; Gov. MSJ ¶ 67.) On April 12, 2012, Smith himself signed a copy of this very form, wherein he indicated no disclosure was required and that he had no conflict. (ALJ Dec. 8; Gov. MSJ ¶ 115; Smith's COI Discl. 3, GE 86.)

### C. Smith's transfer of title to Glenn Wong and deposit of HAP payments into Wong's account

#### 1. Smith transfers title of his Section 8 rental properties to Glenn Wong in November 2011 but retains interests in the properties and Wong's bank account.

In November 2011, Smith transferred titular ownership of his Section 8 rental properties to Glenn Wong via quitclaim deed. (ALJ Dec. 7; Gov. MSJ ¶¶ 97–98; Prop. Transfer Chart, GE 240; Quitclaim Deeds, GE 1, GE 2, GE 41.) Smith submitted the quitclaim deeds to GHURA, but he submitted no other property transfer documents. (ALJ Dec. 7; Gov. MSJ ¶ 98.) However, at the same time they executed the quitclaim deeds, Smith and Wong executed other property

transfer agreements, including a purchase agreement (Purchase Agreement 2011, GE 198), mortgage (Mortgage 2011, GE 200), and promissory note (Promissory Note 2011, GE 199), which gave Smith a security interest in the properties. (Gov. MSJ ¶ 102; ALJ Dec. 7l Sec. Rev. Order 5.) Smith and Wong did not disclose Smith's ongoing security interests received through these additional documents. (ALJ Dec. 7; Gov. MSJ ¶ 102.) Under the terms of the purchase agreement and promissory note, Wong was obligated to pay Smith a $10,000 deposit (Purchase Agreement 2011 2) and make $10,000 monthly payments by check (Promissory Note 2011 1). As part of their agreement, Wong executed a reverse quitclaim deed that transferred Wong's interests in the rental properties back to Smith. (Purchase Agreement 3.)

Section 8 staff later came to understand that Wong was the informally adopted child of Rosita Owen, Smith's mother. (ALJ Dec. 7 n.4; Gov. MSJ ¶ 100.) On November 14, 2011, Wong executed a Special Power of Attorney ("POA") giving Owen authority to operate and manage the rental properties on Wong's behalf. (ALJ Dec. 7; Gov. MSJ at ¶ 101; Special Power of Atty, GE 42.) Wong eventually executed amendments to the relevant HAP contracts to make himself the new landlord, not Smith. (Gov. MSJ ¶ 106; HAP Contracts, GE 100–18.) Wong's physical address as a landlord in GHURA's system was the address for Smith's law office, and his email address in GHURA's system was the email address of Smith's legal secretary, who received GHURA-issued landlord statements for Wong. (ALJ Dec. 7; Sec. Rev. Order 5; Gov. MSJ ¶ 107–08.)

On February 14, 2012, Smith's legal secretary sent GHURA direct deposit information for a First Hawaiian Bank ("FHB") account (ending in -1317) that Wong wanted to use to receive HAP fund deposits for the units to which Wong was identified as the landlord. (ALJ Dec. 7; Gov. MSJ ¶ 109; Sec. Rev. Order 5; GHURA Emails re FHB Acct. -1317.) GHURA rejected the account after it obtained an account certification that showed Smith as a joint account owner.

(ALJ Dec. 7; Sec. Rev. Order 5; GHURA Emails re FHB Acct. -1317 1, 4.) About one month later, on March 8, 2012, Smith's legal secretary submitted a new FHB account (ending in -8369) for which Wong was the sole owner. (ALJ Dec. 7; HUD's MSJ ¶ 110; GHURA Emails re FHB Acct. -8369, GE 46.)

Shortly thereafter, on March 26, 2012, Wong executed a debit authorization on the second FHB account (ending in -8369) for Smith, which Smith used to withdraw HAP funds on multiple occasions. (ALJ Dec. 7; Sec. Rev. Order 5; Gov. MSJ ¶ 111; Debit Auth., GE 131b; *see generally* FHB Receipts, GE 131f.) Wong did not revoke this debit authorization until April 13, 2013, about a month before Smith resigned from GHURA. (Gov. MSJ ¶ 111.) Neither Smith nor Wong ever disclosed the existence of this debit authorization to GHURA or HUD. (*Id.*; ALJ Dec. 7; Sec. Rev. Order 5.)

**2. Smith maintains he has no conflict of interest but discloses his ownership interests at the April 12, 2012 BOC Meeting.**

On March 28, 2012, GHURA's BOC Chairman again directed Smith to the Lujan matter. (ALJ Dec. 8; Gov. MSJ ¶ 114; GHURA Emails re Lujan, GE 50.) Smith responded, "I do not own the units. I transferred upon request of [GHURA's Executive Director]." (ALJ Dec. 8; GHURA Emails re Lujan 1.)

On April 12, 2012, Smith signed a copy of the GHURA conflict-of-interest form which he had helped to draft, certifying that he was in compliance with GHURA and HUD's conflict-of-interest policy and stating he had "no direct or indirect interest." (ALJ Dec. 8; Sec. Rev. Order 6; Gov. MSJ ¶ 115; Smith's COI Discl. 3.) That same day, at a GHURA BOC meeting, Smith argued that he did not decide policy or make decisions with respect to the Section 8 units at issue and, accordingly, should not be considered to have a conflict. (ALJ Dec. 8; Sec. Rev. Order 6; BOC Meeting Tr. Apr. 12, 2012 1–2, GE 26d2.) He noted that he had other apartments, such as the Lauren Rose Apartments in the village of Agat, which he wanted to rent out to HCV tenants

but did not want to have to "circumvent the whole ownership process or anything of that sort[,]" even though he said the restrictions were "easy to get around" and noted that if HUD "want[s] to be legal, we can be legal . . . ." (Gov. MSJ ¶ 116; BOC Meeting Tr. Apr. 12, 2012 7–8.) Smith argued that GHURA could use the contracted conflicts counsel for any conflicted matters and screen Smith from them. (ALJ Dec. 8.) GHURA's BOC Vice Chairman brought up Lujan's conflict matter, noting HUD's conclusion that Lujan had a conflict even though he had transferred his interests to his wife and a local attorney had submitted a contrary legal opinion to the agency. (*Id.*; Gov. MSJ ¶ 116.)

At the same meeting, GHURA's BOC Chairman directed Smith to prepare a letter to HUD, for the Chairman's review and signature, describing Smith's interests. (ALJ Dec. 8; Sec. Rev. Order 6; Gov. MSJ ¶ 119; BOC Meeting Tr. Apr. 12, 2012 5–8.) The Chairman stated it would be "prudent" to "present the case very clearly to HUD." (BOC Meeting Tr. Apr. 12, 2012 8.) Smith never submitted a letter describing all his interests in HAP contracts. (ALJ Dec. 8; Sec. Rev. Order 6.)

On May 3, 2012, GHURA's Executive Director Ray Topasna issued an email, followed by a separate memorandum on May 29, 2012 to Section 8 staff, claiming the BOC's "position" was that Smith was not a covered individual because he did not formulate policy or influence decisions with respect to the Section 8 Program. (ALJ Dec. 8; Sec. Rev. Order 6; Gov. MSJ ¶ 122; Topasna Email May 3, 2012, GE 55.) Topasna's representations were not accurate as the BOC had not reached any decision on Smith; the BOC still expected Smith and Topasna to prepare the letter to HUD regarding Smith's interests in HAP contracts. (ALJ Dec. 8; Sec. Rev. Order 6.) On May 24, 2012, the Executive Director directed Section 8 staff to release all suspended payments "relative to our legal counsel" pending the issuance of a legal opinion from GHURA's conflicts counsel on the issue. (Gov. MSJ ¶ 123; Topasna Email May 24, 2012, GE

57.) No legal opinion was issued by conflicts counsel until April 2013, a month before Smith resigned from GHURA. (*See* Perez Legal Op., GE 85.)

**3. Smith transfers title of another Section 8 property to Wong in August 2012, but Smith manages the properties and maintains interests in the HAP payments.**

In August 2012, Smith executed another quitclaim deed to Wong transferring his interests in a separate property, the Lauren Rose Apartments in the village of Agat. (Gov. MSJ ¶ 124; Quitclaim Deed, GE 3; Quitclaim Affidavit, GE 4.) They recorded only the quitclaim deed on October 9, 2012. (Quitclaim Deed; Quitclaim Affidavit.) Smith and Wong did not record or provide to either GHURA or HUD the purchase agreement (Purchase Agreement 2012, GE 201), promissory note (Promissory Note 2012, GE 202), or mortgage (Mortgage 2012, GE 203) they executed as a part of this 2012 transaction. (Gov. MSJ ¶ 126.) Wong agreed to pay a $10,000 deposit and, thereafter, to make $10,000 monthly payments by check. (*Id.*; Purchase Agreement 2012 1; Promissory Note 2012 1.) Wong again provided a "reverse" quitclaim deed as collateral for Smith, as he did for the 2011 transaction. (Gov. MSJ ¶ 127; Purchase Agreement 1; Rev. Quitclaim, GE 207.) Smith and Wong leased units at this property to Section 8 tenants and received HAP payments for them.

Smith and his legal secretaries managed Wong's rental properties but did not charge Wong for this work. (Gov. MSJ ¶ 165.) Among other tasks, Smith's legal secretaries acted as Wong's power of attorney, collected tenant payments, and even conducted a property inspection. (*Id.* ¶ 166.) Smith fired one of his secretaries for failing to follow through with one of Wong's tenants. (*Id.* ¶ 168.) Smith's secretaries did not observe Wong performing any tasks in relation to the rental properties, and had only heard from Smith that Wong cleaned an air-conditioning unit on one occasion and cut the grass on another. (*Id.* ¶¶ 170–71.) Tenants did not interact with Wong as their landlord. (*Id.* ¶ 171.) The 2011 and 2012 purchase agreements provided that all

utility accounts would be transferred from Smith to Wong within one year of the purchase dates, but none were. (*Id.* ¶¶ 173–75; *see* Purchase Agreement 2011 5; Purchase Agreement 2012 4.) During the entire period of Smith's alleged conflict of interest, only two of the utility accounts were transferred into Wong's name but all payments were made either with a credit card attributed to Smith or, less frequently, with a credit card of unknown ownership. (Gov. MSJ ¶¶ 176–88.) No payments were attributed to Wong. (*Id.*)

Between August 2012 and May 2014, GHURA deposited over twenty (20) HAP payments, totaling $218,296, to Wong's FHB account (ending in -8369). (ALJ Dec. 7; Sec. Rev. Order 6; Gov. MSJ ¶¶ 189–209.) All of those funds ultimately were paid directly to Smith, other accounts on Smith's behalf, or otherwise for Smith's benefit. (ALJ Dec. 7; Sec. Rev. Order 6.)

**4. HUD discovers Smith's potential conflict in September 2012 but GHURA continues to make payments on Wong's HAP contracts while GHURA seeks HUD's waiver on behalf of Smith.**

On September 9, 2012, HUD learned that Smith might have a conflict of interest. (ALJ Dec. 8; Sec. Rev. Order 6; Gov. MSJ ¶ 212.) HUD believed David Lujan to be GHURA's legal counsel but GHURA's Section 8 Administrator informed HUD that Smith was actually current legal counsel, and that she believed a conflict existed. (Kaoholokula Email Sept. 19, 2012, GE 60.) On September 20, 2012, HUD reminded GHURA that the GHURA BOC "is not empowered to waive the conflict of interest provisions," that any conflicts "must stop immediately[,]" and demanded that GHURA submit an accounting of relevant HAP contracts and payments within fourteen (14) days. (ALJ Dec. 8; Gov. MSJ ¶ 213; Flores Email Sept. 20, 2012, GE 59.) GHURA suspended payments to Wong that same day, at the direction of Executive Director Topasna. (ALJ Dec. 8; Gov. MSJ ¶ 214; Topasna Memo, GE 63; Topasna Letter 42, GE 67.) At the September 27, 2012 BOC meeting, Topasna notified the BOC of HUD's conflict-of-interest investigation but did not name any individual. (Gov. MSJ ¶ 216; BOC Meeting Tr. Sept. 27,

2012 1–3, GE 26f2.) Further, Millie Taitano noted that, despite the BOC Chairman's earlier directive to Smith in April 2012 to prepare a letter describing his interests in the rental properties transferred to Wong, Smith never prepared the letter. (Gov. MSJ ¶¶ 216–17; BOC Meeting Minutes Sept. 27, 2012 14–16, GE 66.)

At a BOC meeting on October 25, 2012, while discussing HUD's conflict-of-interest investigation and the necessity of hiring additional legal counsel to submit a legal opinion to HUD about compliance with local law, Smith stated he has no conflict and does not "own any property here in GHURA." (BOC Meeting Tr. Oct. 25, 2012 1–4, GE 26g2; BOC Meeting Minutes Oct. 25, 2012 9–13, GE 69; *see* Gov. MSJ ¶ 218.) Smith did not disclose his relationship with Wong or his ongoing interests in the rental properties and HAP payments. (Gov. MSJ ¶ 218.)

At a BOC meeting on November 8, 2012, the Board was informed it received notice from HUD about the conflicts of interest brought to HUD's attention. (BOC Nov. 8, 2012 Mins. 2–6, GE 73.) GHURA's Executive Management identified six employees that may have conflicts per the regulations, in addition to the Governor and GHURA's conflicts counsel—Cabot Mantanona LLP. (*Id.* at 2) Management sought Board approval to proceed with the request for waivers from HUD for all these individuals. (*Id.*) Executive Director Topasna then informed the Board that Cabot Mantanona LLP resigned as GHURA's conflicts counsel the day before the BOC meeting. (*Id.* at 3.) During the discussion of the conflict of interest issue and the need for waivers to be submitted to HUD, Smith made a statement that HUD could still waive these conflicts. (*Id.* at 5.) For their next meeting, the BOC directed GHURA Management to report on how many contracts are affected by the waivers, and the amounts in dollar terms. (*Id.* at 6.) On December 10, 2012, GHURA's new Executive Director, Mike Duenas, instructed staff to release HAP

payments to two landlords, including Wong, while the waiver request was prepared. (Gov. MSJ ¶ 222.)

On December 28, 2012, HUD's Honolulu Field Office emailed Executive Director Duenas, relaying the concerns of HUD's Regional Administrator that Wong's "contracts continue to receive money without this matter coming to a head." (*Id.* at ¶ 223; Flores Email Dec. 28, 2012, GE 76.) GHURA forwarded HUD's email to Rick Bordallo, a local attorney, asking for a waiver request from Smith to be submitted to HUD no later than December 31, 2012. (Flores Email Dec. 28, 2012 1.) Bordallo responded that he would "confirm with Mark" about his "recommendations on how to proceed." (*Id.*) Smith himself never submitted a waiver request.

**5. GHURA submits a waiver request on behalf of Smith to HUD in April 2013.**

On April 23, 2013, acting independently from Smith, GHURA's Executive Director Duenas submitted a waiver request for Smith to HUD, dated April 15, 2013. (ALJ Dec. 9; Sec. Rev. Order 6; Gov. MSJ ¶¶ 229, 237.) Attached to the waiver request was a legal opinion that Smith was not a covered individual, drafted by GHURA's conflicts counsel Anthony Perez from the Law Office of Anthony Perez. (Gov. MSJ ¶¶ 231–37; Perez Legal Op.) Mr. Perez's legal opinion asserts:

> Attorney Smith has deeded ownership of his Section 8 units to Mr. Wong via quitclaim deed. . . . Through execution of the quitclaim deed, Attorney Smith has transferred all his interests in these properties to Mr. Wong, and thus has no ownership interest left. . . . Furthermore, there is no evidence that Attorney Smith receives any payments or benefits under Mr. Wong's HAP contracts. Mr. Wong has a personal bank account that directly receives Section 8 payments of which Attorney Smith is not an account holder.

(Perez Legal Op. 4–5.)

HUD's Honolulu Field Office forwarded the waiver request to HUD headquarters, recommending that the request be denied because "[n]either [Mr. Perez] nor Mr. Smith has

provided satisfactory evidence that the conflict of interest has been resolved . . . .” (Gov. MSJ ¶ 237.) The Field Office concluded Smith was a covered individual because “he is a subcontractor under a legal services contract with GHURA, and is involved in providing legal counsel and interpretation and advice to GHURA regarding program regulations, rules, processes, and policy.” (*Id.*) The Field Office noted Wong’s use of Smith’s mother as power of attorney and Smith’s “access to Wong’s bank account where Section 8 monies are deposited.” (*Id.*)

**D. Smith’s resignation and post-resignation events**

In late May 2013, an advisor to the Governor of Guam met with Smith and GHURA’s Chairman to address Smith’s conflict of interest; Smith agreed to let the Chairman look at the property transfer documents in Smith’s office. (ALJ Dec. 9; Sec. Rev. Order 6; Gov. MSJ ¶ 239.) Smith resigned as legal counsel within twenty-four (24) hours of the Chairman’s review of those documents. (ALJ Dec. 9; Sec. Rev. Order 6; Gov. MSJ ¶ 240.) On May 23, 2013, GHURA’s BOC accepted Smith’s resignation, effective as of May 21, 2013. (BOC Meeting Minutes May 23, 2013 2–3, GE 92; Gov. MSJ ¶ 240.) GHURA notified HUD of Smith’s resignation on May 22, 2013. (Gov. MSJ ¶ 240.) HUD still wanted the waiver request because of the one-year “tail” in the conflict-of-interest provisions, and GHURA resubmitted the request in June 2013. (*Id.* at ¶¶ 240, 242.)

In 2014, when Smith needed funding for a separate development, Wong sold the Smith Apartments and paid the $687,098.72 in sales proceeds to Smith. (Gov. MSJ ¶ 160.) At roughly the same time and for the same purpose, Wong also took out a mortgage with the Bank of Guam for $350,000 on three of the properties and sent the mortgage proceeds to Smith. (*Id.* ¶ 162.)

In 2015, Smith and Wong retroactively changed the purchase price and terms of the 2011 and 2012 property transactions. (*Id.* ¶ 146.) Smith received assistance from certified public accountants in this retroactive process and with a Department of Revenue and Taxation audit for

tax years 2008–2013. (*Id.* ¶¶ 130–57.) Their work resulted in new promissory notes and mortgages for both the 2011 and 2012 transactions. (*Id.* ¶ 147.) Five and a half years later, Smith recorded the replacement mortgage for the 2012 transaction on June 4, 2021, shortly after Wong passed away. (*Id.* ¶ 159.)

## IV. JUDICIAL REVIEW OF AN ADMINISTRATIVE PROCEEDING STANDARD

This matter is a judicial review of an administrative proceeding. Therefore, summary judgment in an original district court proceeding pursuant to Fed. R. Civ. P. 56 is not at play. Rather, this Court is reviewing a decision of an administrative agency which is itself the finder of fact. Summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did. *Occidental Eng'g Co. v I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985); *see also Benhoff v. United States Dep't of Justice*, No. 16-CV-1095-GPC (JLB), 2017 WL 840879, at *4 (S.D. Cal. Mar. 3, 2017) ("[T]he standard on summary judgment in a standard civil case is different than reviewing an agency decision"). When reviewing an agency's decision, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co.*, 753 F.2d at 769. Accordingly, the Court is "limited to review of the administrative record." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988).

In terms of the standard of judicial review under the PFCRA, "[t]he decisions, findings and determinations of the authority with respect to questions of fact shall be final and conclusive, and shall not be set aside unless such decisions, findings, and determinations are found by the court to be unsupported by substantial evidence." 31 U.S.C. § 3805(c). "[D]ue account shall be taken of the rule of prejudicial error." *Id.* "Substantial evidence is more than a mere scintilla, but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as

adequate to support the conclusion." *Orteza v. Shalala*, 50 F.3d 748, 749 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). A court reviewing an agency's determination must uphold the decision if it is supported by substantial evidence, even if it would "be inclined to find otherwise on a de novo hearing." *United States v. Spears*, 859 F.2d 284, 292 (3d Cir. 1988).

## V. DISCUSSION

The PFCRA, codified at 31 U.S.C. §§ 3801 et seq., provides the federal government with a civil remedy for false, fictitious, or fraudulent claims. The statute imposes civil liability on any person who "makes, presents, or submits, or causes to be made, presented, or submitted, a claim that the person knows or has reason to know[:]"

> (A) is false, fictitious, or fraudulent;
> (B) includes or is supported by any written statement which asserts a material fact which is false, fictitious, or fraudulent;
> (C) includes or is supported by any written statement that[:]
>> (i) omits a material fact;
>> (ii) is false, fictitious, or fraudulent as a result of such omission; and
>> (iii) is a statement in which the person making, presenting, or submitted such statement has a duty to include such material fact; or
>
> (D) is for payment for the provision of property or services which the person has not provided as claimed[.]

31 U.S.C. §§ 3802(a)(1)(A)–(D). The statute subjects violators to a civil penalty of $8,500[6] per claim and to an assessment, in lieu of damages, of up to twice the amount of the claim. *Id.* § 3801(a). Individuals can seek judicial review of agency determinations by filing a petition in

---

[6] The text of the PFCRA states the civil penalty amount is $5,000. *See* 31 U.S.C. § 3802(a). However, the PFCRA is subject to the Federal Civil Penalties Inflation Act of 1990, and the penalties have been adjusted annually. The maximum penalty for false claims made before February 19, 2013, is $7,500 per claim. 72 Fed. Reg. 5586, 5588 (Feb. 6, 2007) (HUD final rule, effective March 8, 2007). The cap for civil penalties was increased to $8,500 per claim made on or after February 19, 2013. 78 Fed. Reg. 4059 (Jan. 18, 2013) (HUD final rule, effective February 19, 2013). These amounts are reflected in the administrative proceeding orders. (ALJ Dec. 20 n.12.)

the proper federal district court. *Id.* § 3805(a)(2), (b)(1)(A)(i)–(ii). The statute contains an exhaustion requirement:

> Any district court reviewing under this section the decision, findings, and determinations of an authority shall not consider any objection that was not raised in the hearing conducted pursuant to section 3803(f) of this title unless a demonstration is made of extraordinary circumstances causing the failure to raise the objection.

*Id.* § 3805(d). Finally, on judicial review, the ALJ's decisions, findings, and determinations will be final and conclusive, unless such decisions, findings, and determinations are found to be unsupported by substantial evidence. *Id.* § 3805(c).

Here, the ALJ found Smith liable for 25 false claims to HUD. (ALJ Dec. 20.) After Smith appealed, the Secretarial Designee upheld the ALJ's determination. (Sec. Rev. Order 20.) In this judicial review action, Smith advances four main arguments to support vacating the administrative orders: (1) the $150,000 statutory cap under the PFCRA was exceeded; (2) Smith was not a "covered individual" under the governing regulation; (3) the false representations were not material; and (4) the assessments and penalties imposed were unconstitutional. (Smith's MSJ 2.) HUD opposes all four arguments, and, as a threshold matter, argues that the Court should dismiss Smith's entire petition for lack of jurisdiction because of Smith's failure to administratively exhaust his arguments by raising them in the administrative proceedings. (HUD'S MSJ 8.) The Court addressees each of Smith's arguments in turn.

**A. As a threshold matter, the Court will examine each of Smith's arguments, even though he did not raise these arguments during the administrative proceedings.**

HUD argues that Smith failed to administratively exhaust his arguments because he did not raise them in the administrative proceedings. (HUD'S MSJ 8.) It asserts that absent extraordinary circumstances and relying on the administrative exhaustion provision, "this Court has no jurisdiction to consider objections Smith did not raise in the hearing before the ALJ." (*Id.* (citing 31 U.S.C. § 3805(d)).)

In reply, Smith argues as a general matter that the administrative exhaustion requirement outlined at 31 U.S.C. § 3805(d) does not apply to this petition because Smith was never afforded a § 3803(f) hearing. (Smith's Reply 7, 13, 15, 18.) In its cross-reply, HUD argues that, based on the PFCRA's statutory text, "the 'hearing' referenced in § 3803(f) is the entire adjudication before the ALJ, which may end in summary judgment." (HUD'S Reply 6 n.2 (citing 24 C.F.R. § 26.32(l)).) Further, HUD argues that Smith never requested an evidentiary hearing or oral argument before the ALJ, and that neither "the PFCRA nor due process requires a live evidentiary hearing or oral argument." (*Id*. (citing *Matthews v. Eldridge*, 424 U.S. 319, 339–40 (1976); *Pac. Harbor Cap., Inc. v. Carnival Air Lines Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000)).)

It is common for an agency's regulations "to require issue exhaustion in administrative appeals." *Sims v. Apfel*, 530 U.S. 103, 108 (2000). When regulations require such exhaustion, "courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues." *Id.* Therefore, "[a]s a general rule, if a petitioner fails to raise an issue before an administrative tribunal, it cannot be raised on appeal from that tribunal." *Reid v. Engen*, 765 F.2d 1457, 1460 (9th Cir. 1985). "This axiom of administrative law is embodied in many legislative schemes . . . ." *Id.* However, this principle has its exceptions; courts "may decide an issue not raised in an agency action if the agency lacked either the power or the jurisdiction to decide it. This situation is typified by challenges to the constitutionality of a statute, or challenges to the constitutionality of a regulation promulgated by the agency." *Id.* at 1460–61 (internal citations omitted).

Based on a plain reading of 31 U.S.C. §§ 3805(d), 3803(f), and 3803(d)(2), the Court agrees with HUD: the "hearing" referenced in § 3805(d) is the entire adjudication before the "presiding officer." Section 3805(d) prohibits the district court from considering "any objection that was not raised in the *hearing conducted pursuant to section 3803(f)* of this title unless a

demonstration is made of extraordinary circumstances causing the failure to raise the objection" (emphasis added). Section 3803(f) in turn refers to hearings commenced under § 3803(d)(2). Under § 3803(d)(2)(B)(i), "the presiding officer shall commence such hearing by mailing . . . a notice which complies" with the relevant statutory provisions. HUD regulations reinforce this point: "[f]or Program Fraud Civil Remedies actions the hearing is commenced by the issuance of a notice of hearing and order by the ALJ, as set forth in 31 U.S.C. § 3803(d)(2)(B)." 24 C.F.R. § 26.45(d). After the hearing is commenced by the notice, the ALJ is permitted to "decide cases, in whole or in part, by summary judgment where there is no disputed issues of material fact[.]" *Id.* § 26.32(l). As a result, any objection not made from the time notice was issued to the time the case reaches a disposition would be considered an unexhausted issue in the administrative proceeding.

As such, HUD's exhaustion argument appears generally meritorious. However, Smith makes issue-specific arguments for each of his asserted arguments in support of his petition for judicial review as to why administrative exhaustion is not required. The Court will address each of these issue-specific arguments as follows.

**B. PFCRA's Statutory Cap of $150,000**

Smith argues that the administrative orders should be vacated because the ruling exceeded PFCRA's statutory cap, which—at the time of the alleged conduct and when the administrative proceeding began—precluded proceedings under the statute when more than $150,000 was sought for "a fraudulent claim or a group of related claims." (Smith's MSJ 10 (quoting *Roberts v. Shinseki*, 647 F.3d 1334, 1341 (Fed. Cir. 2011)).) In opposition to Smith's argument, and in support of its own motion for summary judgment, HUD argues that the Court lacks jurisdiction to consider Smith's argument because he did not raise it in the administrative proceeding. (HUD's MSJ 10 (citing 31 U.S.C. § 3805(d)).) HUD also disagrees with Smith on

the merits of this argument, stating that the claims must be grouped by submission, meaning each month that Smith did not disclose or seek a waiver from HUD is a singular claim or group of claims; HUD argues there are 25 groups of claims based on the 230 individual requests by Smith for HAP funds which resulted in his receipt of payments on 25 different dates. (HUD's MSJ 10–11; 2017 HUD Amended Compl.; 2018 HUD Compl., ECF No. 14-5.) Because Smith did not raise this issue during the administrative proceeding, the Court does not have jurisdiction to review this argument. As noted by the Ninth Circuit in *Reid*, "[e]xhaustion rules . . . avoid the application of judicial resources to matters which might be resolvable at the agency level." *Reid*, 765 F.2d at 1461. The exception to the general principle governing the exhaustion rule is if the agency lacked either the power or the jurisdiction to decide it. *Id*. Here, as shown below, the issue could have been decided before the ALJ or the Secretarial Designee on appeal. Smith did not raise this issue before either.

**1. Smith did not exhaust the statutory cap argument during the administrative proceedings.**

Smith characterizes exhaustion of this issue as jurisdictional and argues that "[l]ack of jurisdiction can be raised at any time, even by a party who once conceded the tribunal's jurisdiction." (Smith's Reply 11 (citing *Rainero v. Archon Corp.*, 844 F.3d 832, 841 (9th Cir. 2016)).) HUD disagrees about the issue being jurisdictional (HUD's MSJ 10), and further argues that Smith cannot rely on "judicially-developed exceptions to non-statutory administrative exhaustion doctrines" to escape exhaustion requirements. (HUD's Reply 6–7, 15 (citing *Reid*, 765 F.2d at 1461–62).)

Based on Ninth Circuit precedent, the Court concludes it cannot consider Smith's statutory cap argument because it was not raised in the administrative proceeding. In *Reid*, the Ninth Circuit identified issues that were both examples of the rule and its exceptions. 765 F.2d at 1460. The Ninth Circuit found that it was inappropriate to address the appellant's statutory

arguments, which it characterized as "nonconstitutional questions of statutory interpretation and applicability." *Id.* at 1462. By contrast, the Ninth Circuit found that it *could* address the merits of constitutional arguments challenging the power and jurisdiction of the National Transportation and Security Board even though they were not raised in the administrative proceeding. *Id.* at 1461 (arguments asserting that suspension process was unconstitutional, "public interest" standard of 42 U.S.C. § 1429(a) was too indefinite to satisfy due process, and ex parte sanction procedure violated procedural due process). Smith's statutory cap argument is a nonconstitutional question of statutory interpretation and applicability; thus, the Court cannot address the merits of the issue on appeal absent a demonstration of extraordinary circumstances causing the failure to raise the objection. *See* 31 U.S.C. § 3805(d). No extraordinary circumstances have been presented here.

**2. The Court does not have jurisdiction to address the PFCRA statutory cap.**

Even had Smith exhausted the issue before the ALJ or Secretarial Designee upon review, the Court finds that the statutory cap is not subject to judicial review. Whether the statutory cap was exceeded is a determination left exclusively to the agency's reviewing official. *See* 31 U.S.C. §§ 3803(c)(1), 3805(a)(1) ("A determination by a reviewing official under section 3803 of this title shall be *final* and *not subject to judicial review*" (emphasis added)).

A plain reading of § 3805(a)(1) leads this Court to conclude that it prohibits judicial review of the agency reviewing official's determination that the allegations fall below the $150,000 cap. Under § 3805(a)(1), "[a] determination by a reviewing official under section 3803 of this title shall be final and shall not be subject to judicial review." Under the jurisdictional cap provision of the PFCRA, "no allegation of liability . . . shall be referred to a presiding officer . . . if *the reviewing official determines*" that an amount of money in excess of $150,000 is requested. 31 U.S.C. § 3803(c)(1) (emphasis added). Thus, under the PFCRA's language, the

agency reviewing official's determination that allegations fall below the statutory cap is "final and shall not be subject to judicial review." *See* 31 U.S.C. § 3805(a)(1). Although there is a "strong presumption" in favor of judicial review when interpreting statutes that limit or preclude review, this presumption "may be overcome by clear and convincing indications, drawn from specific language, specific legislative history, and inferences of intent drawn from the statutory scheme as a whole that Congress intended to bar review." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016) (quoting *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349–50 (1984)).[7] In this instance, the PFCRA's statutory provisions make clear the reviewing official's determination is unreviewable by this Court. For these reasons, the Court GRANTS summary judgment in favor of HUD on the issue of the PFCRA's statutory cap.

**C. Smith knew or had reason to know that he was a covered individual and thus his claims for HAP payments were false.**

Smith argues that he was not a covered individual, as defined by the HAP contracts and HUD regulation, when interpreting the term using traditional tools of construction and therefore the conflict of interest prohibition does not apply to him. (*See* Smith's MSJ 11–15.) He further

---

[7] If the Court had jurisdiction to review this claim, the Court would conclude that the statutory cap was not exceeded. The statutory cap is limited to a "claim or in a group of related claims which are submitted *at the time* such claim is submitted." 31 U.S.C. § 3803(c)(1) (emphasis added). GHURA issued a single payment each month for multiple requests for HAP payments, each for a specific tenant and month. (*See* HUD's MSJ 10.) Under the PFCRA, each "individual request or demand for property, services, or money constitutes a separate claim." 31 U.S.C. § 3801(b)(1). Therefore, for each month that Smith did not disclose his conflict of interest or seek a waiver, GHURA issued payments for "a group of related claims"—each request for payment based on multiple HAP contracts every month. Due to the temporal window the statute provides—"submitted *at the time* such claim is submitted"—the Court finds that each month's payment is a claim or group of related claims subject to the statutory cap. The monthly payments ranged from $918 to $34,913 (*see* Smith Check Register, GE 98; Wong Check Register, GE 99; Section 8 Check Register, GE 214b), far below the $150,000 statutory cap. The amounts sought for each claim are laid out clearly in HUD's complaints in the administrative proceedings. (*See* 2017 HUD Amended Compl. ¶ 22 *in* 17-JM-0135-PF-004, ECF No. 14-4; 2018 HUD Compl. ¶¶ 76, 86 *in* 18-JM-0208-PF-010 14–15, 16, ECF No. 14-5.)

argues that HUD's interpretation of the term, as articulated in the Secretarial Review Order, is not entitled to any deference under principles of administrative law. (*See generally id.*) In response, HUD contends Smith is barred from making this argument because he did not administratively exhaust it. (HUD's MSJ 12.) On the merits, HUD argues that Smith was a covered individual considering the work he did as GHURA's legal counsel, and cites to the administrative proceeding orders which found Smith was a covered individual. (*Id.* at 12–17; ALJ Dec. 12–13; Sec. Rev. Order 9–14.) Based on the plain language of the HUD regulations governing GHURA's contractors, this Court concludes Smith as general legal counsel for GHURA was a covered individual and therefore had a conflict of interest because of his concurrent interest in the HAP contracts. *See* 24 C.F.R. § 982.161.

**1. Legal Standard**

As a Section 8 landlord, Smith was required to sign and adhere to the terms of HAP contracts for each property. (*See* Sec. Rev. Order 9.) The HAP contract, consistent with 24 C.F.R. § 982.161, prohibits a covered individual from having any interest in any HAP contract, benefits or payments because it constitutes a conflict of interest. (*See, e.g.*, HAP Contract 6 ¶ 13.)

> a. "Covered individual" means a person or entity who is a member of any of the following classes:
> (1) Any present or former member or office of the PHA (except a PHA commissioner who is a participant in the program);
> (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the programs;
> (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
> (4) Any member of the Congress of the United States.

(*Id.* ¶ 13.a.) *See also* 24 C.F.R. § 982.161. By executing the contract, "the owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at

execution of the HAP contract, or at any time during the HAP contract term." (*See, e.g.*, HAP Contract 6 ¶ 13.d.; Sec. Rev. Order 9.)

Generally, an administrative agency's interpretation of its own regulation is entitled to deference under certain circumstances. *Auer v. Robbins*, 519 U.S. 452 (1997); *see Kisor v. Wilkie*, 588 U.S. 558, 573–79 (2019) (upholding the *Auer* deference standard). "First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Kisor*, 588 U.S. at 574 (internal citations omitted). "And before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id.* at 575. "To make that effort, a court must 'carefully consider' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* (internal citation and alterations omitted). "Doing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference." *Id.*

**2. Smith properly raised this objection during the administrative proceeding.**

As a procedural matter, HUD argues that the Court does not have jurisdiction to consider Smith's "*noscitur a sociis* objection" under 31 U.S.C. § 3805(d) because it was never specifically raised in the administrative proceedings, although HUD recognizes that "Smith generally argued he was not a covered individual[.]" (HUD's MSJ 12.) Smith argues that "it is claims that are exhausted, not specific arguments," citing *Mendoza v. Bondi*, 133 F.4th 139, 145 n.1 (1st Cir. 2025) and *Singh v. Garland*, 118 F.4th 1150, 1165 (9th Cir. 2024). (Smith's Reply 7.)

Here, the Court finds Smith objected to being a covered individual in the administrative proceedings, and that he has sufficiently exhausted the objection for the Court's review, even if he is raising the *noscitur a sociis* legal argument for the first time on judicial review. As the Ninth Circuit articulated, "parties present issues and claims for determination, not specific arguments or theories, and Supreme Court authority makes clear that we are not limited to the

particular arguments raised by the parties in resolving the proper application of governing law." *Singh*, 118 F.4th at 1165. Thus, the Court will consider Smith's *noscitur a sociis* argument in determining whether Smith was a covered individual under the law.

**3. Smith was properly found to be a "covered individual" in the administrative proceeding.**

The ALJ found that Smith, "as GHURA's legal counsel, influenced [GHURA's] decisions with regard to its Section 8 Program," and concluded that Smith was a covered individual, which was affirmed by the Secretarial Review Order. (ALJ Dec. 12; Sec. Order 14.) Smith argues he was not a "covered individual" under the language in the HAP contracts or the corresponding regulation. (Smith's MSJ 11.) Refuting the agency's interpretation of the regulation, Smith argues he did not influence decisions at GHURA even if his position indicated he could have influenced decisions. (*Id.* at 11–15, 12 ("[T]he language makes clear that . . . the individual must *actually* influence important decisions. If the regulation meant that the person was merely in a position or *capable* of influencing decisions, it would have said so" (emphasis in original)).) On the other hand, HUD argues that Smith's interpretation of the regulation is incorrect under the law, that the agency properly found he was in a position to influence, and did influence, Section 8 Program decisions at GHURA, making him a covered individual. (HUD's MSJ 12–17.) In particular, HUD relies on the examples offered in the Secretarial Review: Smith (1) proposed revisions to the conflict-of-interest disclosure form for the Section 8 Program, which were adopted by GHURA; (2) prepared a legal memorandum for GHURA's former deputy director addressing consequences GHURA could face for failures to comply with HUD requirements, including Section 8 requirements; and (3) lobbied the GHURA BOC on his own behalf, claiming he did not have impermissible conflict, resulting in GHURA's Executive Director incorrectly informing staff that Smith did not have a conflict and to release payments to Wong. (*Id.* at 13–14; ALJ Dec. 11–12; Sec. Rev. Order 12–14.)

The Court finds that a plain reading of the regulation supports the conclusion that individuals in a position to influence decisions with respect to the Section 8 Program fall within its scope. The regulation defines distinct "classes of persons" who may not have any direct or indirect interest in a HAP contract. *See* 24 C.F.R. § 982.161. Sub-provisions (a)(1), (a)(3), and (a)(4) outline specific positions that are barred from holding an interest—(1) any present or former member or officer of the PHA (except a participant commissioner); (3) any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the programs; or (4) any member of the Congress of the United States. In light of these neighboring sub-provisions, it is most natural to also read sub-provision (a)(2) to refer to specific positions—in relevant part, contractors, subcontractors, or agents of the PHA who influence decisions with respect to the programs.

The Court agrees with HUD that Smith's proposed interpretation fails. First, Smith's proposed interpretation that the decisions influenced "must be on a disputed matter of major importance," because it shares the same subdivision as formulating policy, ignores the disjunctive *or* in the subdivision, indicating the two phrases have different meanings. (*See* Smith's MSJ 12; 24 C.F.R. § 982.161(a)(2).) Smith's interpretation narrows the regulation significantly, far beyond its ordinary meaning. *See United States v. Paulson*, 68 F.4th 528, 536 (9th Cir. 2023); *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (holding that when meaning is clear, a court should not supply "absent provisions," or "interpret what has no need of interpretation.").

Second, Smith's position as legal counsel to GHURA put him in a position to influence decisions. The duties outlined in Smith and GHURA's attorney-client fee agreement included preparing "opinions, resolutions and reports at the request of any members of the Board of Commissioners (BOC) or [E]xecutive Director or its designee"; advising "the Board and the

Executive Director of all legal matters to which the Authority is a party or in which the Authority is legally interested"; providing "legal assistance and advice during any negotiations with the Authority's tenants and contractors"; and attending "all Board of Commissioners meetings." (Legal Services Contract 1–2.) As GHURA's legal counsel, Smith certainly was in a position to influence decisions with respect to the Section 8 Program. Moreover, Smith did influence decisions.

Smith's revision of the conflict-of-interest disclosure form further supports that Smith was a covered individual. At the direction of GHURA's BOC Chairman, Smith reviewed and proposed revisions to GHURA's conflict-of-interest disclosure form—used for all programs including the Section 8 Program—to incorporate disclosure requirements under federal and local law. (BOC Transcript Feb. 21, 2012 1.) Smith discussed his proposed changes at a subsequent BOC meeting, noting that the language was broad enough to cover both direct and indirect interests and that step- and half-sibling relationships would be covered. (*Id.*) By reviewing and proposing revisions to the conflict-of-interest disclosure form, Smith influenced the Board to adopt the form based on his legal opinion that it sufficiently requests conflict disclosures required by federal and local law. This decision to approve the form was directly related to the Section 8 Program, as the form requires disclosure of conflicts related to all GHURA programs. (*See* Smith's COI Discl. Apr. 12, 2012 3.)

The legal memorandum was an example of Smith influencing GHURA's decision to pursue adverse actions against employees by affirming GHURA's decision, highlighting the consequences to GHURA and even the Section 8 Program specifically of failing to strictly adhere to the relevant rules and regulations. (Sec. Rev. Order 13–14.) Smith argues now that his memorandum was "comment[ing] on a decision that GHURA had *already* made to pursue adverse actions against employees[.]" (Smith's MSJ 13 (emphasis in original).) The Court

disagrees and finds that Smith's legal memorandum, in providing the legal justification to support GHURA's decision, influenced GHURA within the meaning of the regulation.

Smith's arguments directly to the Board at the April 12, 2012 BOC meeting during his attendance as GHURA's legal counsel that he is not a covered individual knowing he was still a Section 8 landlord is the exact situation the conflicts prohibition is intended to prevent.

Considering these facts, the Court finds there is substantial evidence supporting the agency's decision. As such, the Court GRANTS summary judgment in favor of HUD on the issue of whether Smith was a covered individual.

**D. Smith's misrepresentations were material.**

Smith argues that the administrative order should be vacated because the alleged false representations were not material, as required by the statutory language of the PFCRA and under the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). (Smith's MSJ 15.) Specifically, Smith argues that HUD's payment of claims in Smith's case despite its knowledge that the conflict of interest requirement was violated is very strong evidence of the conflict-of-interest provision's immateriality under *Escobar*. (*Id.* at 15–16.) Smith also relies on Justice Thomas's concurring opinion in *Kousisis v. United States*, 145 S. Ct. 1382, 1400–01 (2025), for his articulation of the materiality test as the "essence-of-the-bargain standard," which is "rigorous and context specific." (*Id.* at 17.)

In opposition and on its own cross-motion for summary judgment, HUD argues that Smith failed to exhaust this argument. (HUD's MSJ 17.) On the merits, HUD argues that materiality should be assessed by the way HUD "*generally* treats the conflict-of-interest provision" rather than the way it treated the provision in Smith's specific case. (*Id.* at 18.) Further, HUD argues that even when viewing HUD's actions in relation to Smith's specific case, there is overwhelming evidence of materiality. (*Id.* at 18–19.) Lastly, HUD argues that Justice

Thomas's concurrence in *Kousisis* is not controlling, and even if it were, it does not help Smith. (*Id.* at 20–22.)

In his reply, Smith maintains his position and argues that "at least a remand is required for consideration of materiality under the proper legal standard" because the Secretarial Review Order incorrectly reasoned that "HUD's knowledge of whether certain requirements were violated when HAP payments were made is immaterial." (Smith's Reply 15.) In response, HUD notes this statement is true because "HUD was totally unaware of Smith's conflict-of-interest for many payments, it never had full knowledge of his interests at the time of any of the payments, and it unequivocally told GHURA to stop paying Smith and Wong without ever rescinding or deviating from that direction." (HUD's Reply 17–18.) Most importantly, HUD points out that "Smith has no evidence HUD ever *approved of* or *endorsed* GHURA's actions." (*Id.* at 18.) The Court finds there is substantial evidence supporting the ALJ and Secretarial Designee's findings and therefore denies Smith's request for remand on this ground.

**1. Legal Standard**

The 2017 and 2018 HUD Complaints specifically charged Smith with violations of 31 U.S.C. § 3802(a)(1). (2017 Amended HUD Compl. 11–12; 2018 HUD Compl. 13–15.) Section 3802(a)(1) states:

> (a)(1) Any person who makes, presents, or submits, or causes to be made, presented, or submitted, a claim that the person knows or has reason to know—
> (A) is false, fictitious, or fraudulent;
> (B) includes or is supported by any written statement which asserts a material fact which is false, fictitious, or fraudulent;
> (C) includes or is supported by any written statement that—
> (i) omits a material fact;
> (ii) is false, fictitious, or fraudulent as a result of such omission; and
> (iii) is a statement in which the person making, presenting, or submitting such statement has a duty to include such material fact; or
> (D) is for payment for the provision of property or services which the person has not provided as claimed[.]

The PFCRA defines a "claim" at 31 U.S.C. § 3801(a)(3). It states:

(3) "claim" means any request, demand, or submission—
(A) made to an authority for property, services, or money (including money representing grants, loans, insurance, or benefits);
(B) made to a recipient of property, services, or money from an authority or to a party to a contract with an authority—
(i) for property or services if the United States—
(I) provided such property or services;
(II) provided any portion of the funds for the purchase of such property or services; or
(III) will reimburse such recipient or party for the purchase of such property or services; or
(ii) for the payment of money (including money representing grants, loans, insurance or benefits) if the United States—
(I) provided any portion of the money requested or demanded; or
(II) will reimburse such recipient or party for any portion of the money paid on such request or demand; or
(C) made to an authority which has the effect of concealing or improperly avoiding or decreasing an obligation to pay or transmit property, services, or money to the authority[.]

"The PFCRA is a 'sister scheme' to the False Claims Act . . . and is 'designed to operate in tandem with the FCA.'" *Roberts*, 647 F.3d at 1340 (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 786 n.17 (2000)). "The False Claims Act imposes liability on anyone who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017 (9th Cir. 2018) (quoting 31 U.S.C. § 3729(a)(1)(A)). In the Ninth Circuit, "a successful False Claims Act claim requires: '(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay our money or forfeit moneys due.'" *Id.* (quoting *Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)).

Under the False Claims Act, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In *Escobar*, the Supreme Court specifically addressed whether "a defendant should face False Claims Act Liability only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the Government expressly designated a condition of payment." 579

U.S. 176, 190 (2016). The Court noted that the "materiality standard is demanding" and held that "when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 194.

"The Supreme Court then laid out three scenarios that may help courts determine the likely or actual behavior of the government with regard to a given requirement." *Rose*, 909 F.3d at 1019.

> First, "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." Second, the Court explained that, "if the Government pays a particular claim in full despite its *actual knowledge* that certain requirements were violated, that is very strong evidence that those requirements are not material." Third, "if the Government regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."

*Id.* (quoting *Escobar*, 579 U.S. at 194–95).

**2. Smith raised the materiality argument during the administrative hearing.**

As a procedural matter, HUD argues that the Court does not have jurisdiction to consider Smith's objection based on *Escobar* under 31 U.S.C. § 3805(d) because it was never raised before the ALJ, although HUD does recognize that Smith raised it on appeal to the Secretarial Designee. (HUD's MSJ 17.) Smith argues that "HUD's theory of exhaustion is wrong, as the agency addressed Mr. Smith's claim under [*Escobar*] in its final order[,]" citing *Howard v. F.A.A.*, 17 F.3d 1213, 1217 (9th Cir. 1994), to support his position. (Smith's Reply 15.) The Court finds *Howard* supports Smith's argument and concludes it has jurisdiction to consider his *Escobar* argument. In *Howard*, a pilot petitioned for review of the National Transportation Safety Board's decision to suspend his commercial pilot certificate. *Howard*, 17 F.3d at 1213. The Ninth Circuit found that it had jurisdiction to consider the pilot's "arbitrary and capricious"

argument even though he had not raised the issue in his hearing before the ALJ or his appeal of that decision to the full Board; he first raised it in his petition for reconsideration of the Board's order. *Id.* at 1217. The Board ultimately discussed and rejected the pilot's "arbitrary and capricious" argument in its order denying reconsideration, and the Ninth Circuit reasoned that "[b]ecause the Agency did pass on the merits of [the] claim, the purposes behind the exhaustion requirement have been satisfied." *Id.* Considering Smith raised the materiality argument during the Secretarial Review, the Court finds it can consider the materiality argument on judicial review.

**3. Smith's false representations were material to the fraud.**

At the outset, the Court notes that Smith is correct that the Secretarial Review Order's discussion of materiality and *Escobar* is lacking. (Smith's MSJ 17.) The Order is conclusory in stating: "The ALJ's findings that Respondent [Smith] made false statements in writing on his conflict-of-interest form, and that Respondent knowingly made these false statements, which were material to GHURA's decision to reinstate Mr. Wong's HAP payments is not inconsistent with the holding in [*Escobar*]." (Sec. Rev. Order 15.) Although the Secretarial Designee applied the incorrect standard that HUD's knowledge of the conflict was immaterial when payments are actually being made, he reached the correct conclusion. Applying the correct standard below, the Court reaches the same outcome and finds that the false statements about Smith's conflict of interest were material to the fraud. Therefore, there is no reason to remand on the issue of materiality.

Following the Ninth Circuit's materiality analysis in *Rose*, which applies the standard set forth by the Supreme Court in *Escobar*, the Court finds that Smith's violations of the conflict-of-interest provision were material to HUD's decision to make HAP payments. In so doing, the

Court looks at whether payments were made despite actual knowledge of a violation, past department actions, and whether noncompliance was substantial. *Rose*, 909 F.3d at 1020–22.

**a. The conditioning of payment is probative, not conclusive, evidence of materiality.**

First, the *Rose* court considered whether the government conditioned the payment of government funds on compliance with the requirement. *See id.* at 1020. In Smith's case, it is undisputed that compliance with the HAP contracts' conflict-of-interest provision was a condition of receiving HAP payments. (*See, e.g.*, HAP Contract 4, 6 ¶¶ 7.b., 13.a.–b.; 24 C.F.R. § 982.161.) Had Smith or Wong not certified in their HAP contracts that they complied with the conflict-of-interest provision, they could not have been paid. (HAP Contract 4 ¶ 7.b. ("Unless the owner has complied with all provisions of the HAP contract, the owner *does not have a right to receive housing assistance payments* under the HAP contract" (emphasis added), 6 ¶¶ 13.a.–b.; 24 C.F.R. § 982.161.) This is probative evidence of materiality, but is not sufficient, without more, to prove materiality. *Id.*

**b. Past department actions weigh in favor of materiality.**

Next, the *Rose* court considered "the three scenarios bearing on materiality that the Supreme Court enunciated in *Escobar*, though none of them is necessarily required or dispositive." 909 F.3d at 1020–21 (citing *Escobar*, 579 U.S. at 194–95).

First, the *Rose* court considered "whether there is 'evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance' with the [requirement], because such a showing can help establish that the requirement was material." *Id.* at 1021 (quoting *Escobar*, 579 U.S. at 195). By the same token, as its analysis of the third scenario, the *Rose* court examined "whether the Department 'regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were

violated, and has signaled no change in position, [because] that is strong evidence that the requirements are not material." *Id.* (quoting *Escobar*, 579 U.S. at 195).

Here, Smith was directed to the Lujan matter—a matter involving almost identical facts and circumstances—on multiple occasions. In the Lujan matter, Lujan attempted to resolve his potential conflict by transferring his Section 8 properties to his wife, but HUD concluded Lujan was a covered individual with an impermissible conflict; GHURA terminated all of Lujan's HAP contracts at HUD's direction. (ALJ Dec. 6 n.3; Sec. Rev. Order 4 n.3.) Based on HUD's actions with respect to the Lujan matter, there is evidence that Smith knew HUD would refuse to make HAP payments to him as a covered individual with a conflict of interest.

Further, GHURA staff were trained to stop all payments when a possible conflict of interest was discovered, and to ultimately terminate the HAP contract if the conflict was confirmed. (Gov. MSJ 9.) Indeed, on multiple occasions, HUD and GHURA enforced the conflict-of-interest provision as applied to the different classes of covered individuals defined in the regulations. (*Id.* at 9–10, 14–15.) As to Smith himself, there are multiple instances in which payments were stopped whenever a conflict situation was clearly identified by GHURA staff or HUD. Based on these facts, an analysis of the first and third scenarios weigh in favor of materiality.

Here, Smith argues his conflict was immaterial because HUD was aware of his potential conflict in September 2012, and HUD was further aware of GHURA's release of payments on the contracts in December 2012. (Smith's MSJ 16.) The Court largely agrees with Smith's characterization of these two facts, but notes further details supporting a conclusion that the conflict was material. As laid out above, the GHURA Section 8 Administrator in September 2012 informed HUD that Smith was GHURA's current legal counsel and that she believed a conflict existed. (Kaoholokula Email Sept. 19, 2012.) On September 20, 2012, HUD reminded

GHURA that the BOC "is not empowered to waive the conflict of interest provisions," HUD may require GHURA to repay all funds that were paid to an ineligible property owner, that any conflict of interest "must stop immediately[,]" and demanded that GHURA submit an accounting of HAP contracts for conflicted individuals within 14 days. (Flores Email Sept. 20, 2012.) In response, GHURA suspended payments to Wong that same day at the direction of the Executive Director. (Topasna Letter 42.) After further communications between GHURA and HUD, on October 3, 2012, Director Topasna provided records regarding Wong and Smith's potential conflicts to HUD; the records included a list of HAP payments made to Wong and Smith, and a copy of the 2011 quitclaim deed. (*Id. at* 1, 3–27, 28–31.) After Topasna's forced resignation as Executive Director in November 2012, GHURA's new Executive Director, Mike Duenas, instructed staff to release HAP payments to Wong while awaiting HUD's determination on the conflict issue. (Gov. MSJ ¶ 222) On December 28, 2012, HUD emailed Director Duenas, relaying the concerns of HUD's Regional Administrator that Wong's "contracts continue to receive money without this matter coming to a head." (Flores Email Dec. 28, 2012.) This notice to GHURA expressed HUD's concerns about GHURA's decision to reinstate payments without the critical determination by HUD of whether Smith had a conflict of interest; and if so, whether HUD would waive it.

Despite the ongoing payments on Wong's HAP contracts, HUD's actions sufficiently demonstrated materiality. First, though HUD became aware in late 2012 of a potential conflict and received a copy of the 2011 quitclaim deed, HUD did not obtain *actual knowledge* that a violation of the conflict-of-interest provision had occurred based on the undisclosed land documents related to Smith's quitclaim deeds to Wong. The record is unclear as to when HUD gained actual knowledge of their existence; nevertheless, what is apparent is that as of May 2, 2013, the Field Office recommended to HUD headquarters a denial of Smith's waiver request

based on Smith's mother having the power of attorney to manage the Section 8 units, Wong operating his landlord business through Smith's law office, and Smith having access to Wong's bank account where Section 8 monies were deposited. (Gov. MSJ ¶¶ 229, 237.) There was no mention of the undisclosed land documents. Further, although the payments on Wong's contracts continued, the *Rose* court explained that the Government "can demonstrate that requirements . . . are material without directly limiting, suspending, or terminating" payments. *Rose*, 909 F.3d at 1021. Here, HUD's immediate directive in 2012 to GHURA to stop any conflict, demand for accounting within 14 days, and advisement that GHURA may be required to repay all funds that were paid to an ineligible property owner, sufficiently demonstrate that Smith's violation of the conflict-of-interest provision was material. Although Smith showed the additional land documents to the BOC Chairman in May 2013, he never submitted them to GHURA or HUD nor sought a waiver of any potential conflict of interest.

**c. The magnitude of Smith's violation was substantial.**

Lastly, the *Rose* court considered whether the noncompliance was "minor or insubstantial[,]" as the Supreme Court did in *Escobar*. *Rose*, 909 F.3d at 1022. "For instance, were a school to offer admissions representatives cups of coffee or $10 gift cards for recruiting higher number of students, there would be no viable claim under the False Claims Act." *Id.* The *Rose* court found the noncompliance to be significant, based on awards of over $20,000 to admissions representatives who met their enrollment goals, directly contrasting the example of small gift cards. *Id.*

Here, Smith's noncompliance was not "minor or insubstantial." He received notice on multiple occasions about his potential noncompliance, he represented he would take corrective action, and the duration of his noncompliance lasted for years. Further, Smith took steps to conceal his interests in HAP payments by transferring titular ownership of properties to Wong

all the while holding a financial interest in those properties as the mortgagor and holding a "reverse" quitclaim deed as collateral. Furthermore, he involved his law office staff in the administration of Wong's HAP payments and his own mother acted on behalf of Wong as the landlord through the power of attorney given to her by Wong. Lastly, Smith's noncompliance led to the distribution of a significant amount in federal funds—over $260,000 in HAP payments. (Sec. Rev. Order 1.)

Considering these facts, the Court finds there is substantial evidence to support the agency's finding that Smith's misrepresentations were material to the false claims. Therefore, the Court GRANTS summary judgment in favor of HUD on this issue of finding substantial noncompliance on a material fact.

**E. Amount of Assessments and Penalties Awarded**

During the administrative proceeding, the ALJ awarded $532,872 in assessments and $202,500 in civil penalties, totaling $735,372. (ALJ Dec. 20; Sec. Rev. Order 20 (affirming the ALJ's award).) In determining the amount for the assessments award, the ALJ started with the amount of money paid by GHURA for each of the 25 claims made. (*See* 2017 HUD Amended Compl. *in* 17-JM-0135-PF-004 10; 2018 HUD Compl. *in* 18-JM-0208-PF-010 14–15, 16.) The ALJ highlighted that "[o]rdinarily, twice the amount of claims alleged by the Government and a significant civil penalty should be imposed in PFCRA cases to offset the intangible costs of fraud, the expense of investigating fraudulent conduct, and the need for deterrence." (ALJ Dec. 18 (citing 24 C.F.R. § 28.40(b)).) To determine the amount of assessments and civil penalties to award, the ALJ relied on the seventeen (17) delineated factors established in the regulation, as well as any mitigating and aggravating circumstances present in Smith's case. (*Id.*; 24 C.F.R. §

28.40(b).) Of these 17 factors, the ALJ considered all but one[8] and conducted a thorough review of the facts of the case as applied to each factor. (ALJ Dec. 18–20.) The ALJ then awarded the maximum assessments and penalties, which the Secretarial Designee affirmed after a similar consideration of the factors. (*Id.* at 20; Sec. Rev. Order 17–20.)

In his Supplement to this Court, Smith briefly argued that the Supreme Court's decision in *Securities and Exchange Comm'n v. Jarkesy*, 603 U.S. 109 (2024), established that the administrative penalties imposed by HUD in the administrative proceedings violated his right under the Seventh Amendment right to a jury trial. (Suppl. 1, ECF No. 15.) HUD, in its reply and cross motion for summary judgment, argued that *Jarkesy* should not apply in Smith's case for several reasons. (HUD's MSJ 30–31.) In particular, HUD argues that (1) Smith did not obtain leave from this Court to file a supplemental filing under CVLR 7(h);[9] (2) Smith did not exhaust this argument before HUD; and (3) *Jarkesy* applies to legal and punitive, not equitable, remedies, and cites to a district court decision that, as HUD argues, establishes that "*Jarkesy* does not apply to HUD's imposition of civil money penalties for violations of HUD's program requirements." (HUD's MSJ 30–31 (citing *Millennia Housing Mgmt. v. U.S. Dep't of Housing & Urban Dev.*, 783 F. Supp. 3d 1051 (N.D. Ohio Apr. 28, 2025)).)

Smith's reply contends "that the administrative officials summarily adjudicated the matter in violation of his due process and constitutional rights" which sufficiently exhausts the

[8] The only factor that the ALJ did not explicitly consider is 24 C.F.R. § 28.40(b)(15), which addresses prior bad acts similar to the misconduct at issue in the present case. The ALJ remarked in a footnote that it did not appear that there are "any proceedings against [Smith] for other similar misconduct." (ALJ Dec. 19 n.11.)

[9] Smith contends that CVLR 7(h) "appears to apply to supplemental papers filed after the briefing schedule" is completed. (Smith's Reply 6.) This Court disagrees with Smith's reading of the rules. Regardless, Smith's Reply "asks the Court to grant leave to consider this very important constitutional question." (*Id.*) Considering HUD had time to review Smith's supplemental filing and respond to it, and given the importance of this issue, the Court hereby grants Smith leave and accepts his supplemental filing under CVLR 7(h).

issue in the administrative proceedings. (Smith's Reply 7 (citing to Sec. Rev. Order 15–16).) Smith also argues that *Millennia*'s analysis and holding are distinguishable from *Jarkesy* and his own case in several ways. (*Id.* at 7–11.) He argues that the Court should vacate the amount of assessments and penalties outlined in the ALJ's Decision and Secretarial Review Order because the amount awarded is unconstitutional under *Jarkesy*. (Smith's Reply 6.) In response, HUD argues that merely arguing a general due process violation is insufficient to exhaust the issue considering the breadth of such an argument. (HUD's Reply 7–9.) HUD also argues that Smith cannot raise a Seventh Amendment objection because there is no issue of fact in the administrative proceedings, considering the decision issued by the ALJ at HUD was based on a motion for summary judgment. (*Id.* at 9 (citing to 10 Cyc. of Fed. Proc. § 35:36 (3d ed.) ("when there is no genuine issue of fact, the granting of a motion for summary judgment is not a denial of the right to jury trial guaranteed by the Seventh Amendment.")).) HUD then argues that, by failing to raise a jury trial objection over the course of the administrative proceedings, Smith waived that right and "impliedly consented to administrative adjudication." (HUD's Reply 10.)[10] On the merits, HUD argues that Smith's *Jarkesy* argument would fail because the PFCRA imposes equitable, not legal, damages. (*Id.* at 11–15.)

---

[10] The court in *Millennia* discussed that a waiver of a constitutional right must be "clearly established." *Millennia*, 783 F. Supp. 3d at 1070. As such, whether Smith "impliedly consented to administrative adjudication" is irrelevant as it is the waiver being clearly established that determines whether the issue was waived. (HUD's Reply 10; *Millennia*, 783 F. Supp. 3d at 1070 (citing *Brookhart v. Janis*, 384 U.S. at 4).)

The *Jarkesy* decision was issued prior to the issuance of either the ALJ's initial decision or the Secretarial Designee's review order in Smith's case, so Smith could have raised the objection at the very least before the Secretarial Designee upon appeal of the ALJ's decision. *Cf. Millennia*, 783 F. Supp. 3d at 1070 (discussing that the plaintiffs could not have known to waive a right that a court had yet to establish they had).

Despite this, mere completion of the administrative process does not clearly establish waiver of Smith's Seventh Amendment rights because "implied" consent to administrative proceedings does not equate to a clearly established waiver.

**1. Smith did not need to exhaust his Seventh Amendment argument during the administrative proceedings.**

In *Jarkesy*, the Supreme Court held that the Securities and Exchange Commission's ("SEC") initiation of fraudulent claims before the SEC and an ALJ's imposition of $300,000 in civil penalties for the respondents' alleged securities fraud—an enforcement scheme under the Securities Act of 1933, Securities Exchange Act of 1934, and Investment Advisers Act of 1940—violated the respondents' Seventh Amendment right to a jury trial in suits at common law. 603 U.S. at 115–16, 120–21. The Supreme Court found that the respondents were entitled to a jury trial in an Article III court. *Id.* at 140.

Here, the Court finds that administrative exhaustion of this constitutional argument was not required. As discussed previously in *Reid*, as well as in the more recent decision of *National Labor Relations Board v. North Mountain Foothills Apartments* ("*NMFA*"), 157 F.4th 1089 (9th Cir. 2025), cited by Smith (Smith's Suppl. II 1, ECF No. 27), an objection based on the constitutionality of a statute need not be exhausted in an administrative proceeding. *Reid*, 765 F.2d at 1460–61. In *NMFA*, the Ninth Circuit found that administrative exhaustion was not required for the respondent's "argument that the [National Labor Relations Board's] adjudication scheme violates the Seventh Amendment by denying employers the right to a jury trial." 157 F.4th at 1098. Although Smith did not raise a specific Seventh Amendment objection in the administrative proceeding, this issue did not need to be exhausted as it specifically addresses the constitutionality of the PFCRA as a whole because he argues that, under the rule established in *Jarkesy*, the PFCRA's assessments and penalties are punitive.

**2. Smith has a Seventh Amendment right to a jury trial.**

**a. Legal Standard**

To determine whether an administrative proceeding violates an individual's right to a jury trial, the Supreme Court in *Jarkesy* explained that a court must determine whether a claim

is legal in nature. 603 U.S. at 122. "To determine whether a suit is legal in nature, we directed courts to consider the cause of action and the remedy it provides. Since some causes of action sound in both law and equity, we concluded that the remedy was the 'more important' consideration." *Id.* at 122–123 (citing *Tull v. United States*, 481 U.S. 412, 421 (1987)). A monetary penalty can be either legal or equitable. *Id.* at 123. "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Id.* The Supreme Court held that, when factors for civil penalties concern culpability, deterrence, or recidivism—thus punishing the defendant rather than restoring the victim—"such considerations are legal rather than equitable." *Id.* at 124.

Moreover, if the cause of action has a "close relationship" to its common law counterpart, this is additional evidence that civil penalties imposed are designed to be punitive. *Id.* at 125. The *Jarkesy* Court examined the antifraud provisions in the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. *Id.* at 115–16. The Supreme Court compared common law fraud to the antifraud provisions at issue and found that, by deliberately using the word fraud and other common law terms of art in the Securities Act, "Congress incorporated prohibitions from common law fraud into federal securities law." *Id.* at 125 (comparing the antifraud provisions to Restatement (Third) of Torts: Liability for Economic Harm, §§ 9, 13 (2018)). "When Congress transplants a common-law term, the old soil comes with it." *Id.* (citing *United States v. Hansen*, 599 U.S. 762, 778 (2023)). While certainly not identical to each other, the Court held that "the close relationship between federal securities fraud and common law fraud confirms that this action is legal in nature." *Id.* at 126 (internal quotations omitted).

//

/

### b. The Supreme Court's holding in *Jarkesy* governs Smith's case.

In addition to other remedies that may be prescribed by law, the statute in the instant case imposes civil penalties and assessments in lieu of damages which are designed to be penal, not remedial, and it has a close relationship to common law fraud. The PFCRA's civil penalties and assessments are thus legal in nature and the Supreme Court's holding in *Jarkesy* applies. First, in the PFCRA, the imposition of civil penalties and assessments is mandatory, not permissive, and the amount imposed depends on the consideration of the 17 delineated factors as well as any mitigating or aggravating factors in the PFCRA. *See* 31 U.S.C. § 3802(a) (civil penalties and assessments "shall" be imposed); 24 C.F.R. § 24.80(b) (listing factors to consider). The factors do not determine whether civil penalties *should* be imposed, but rather what the amount awarded should be. This is in direct contrast to the statute in *Millennia*, the case on which HUD heavily relies. (HUD's Reply 13–14; *Millennia*, 783 F. Supp. 3d at 1064–65.)

In *Millennia*, the district court addressed Section 537 of the HUD Reform Act of 1989—which gave HUD "the ability to impose civil money penalties against mortgagors and certain other closely related parties for multifamily properties with FHA-insured mortgages." 783 F. Supp. 3d at 1059. The statute imposes civil penalties, but such imposition is *permissive*, not mandatory, and the awarding of such penalties depends on a list of factors. *Millennia*, 783 F. Supp. 3d at 1064–65 (denied Plaintiffs' motion for injunctive relief to halt the scheduled ALJ proceeding before the OHA, recognizing that "[t]he ALJ could make a determination against Plaintiff, but decide to impose an equitable remedy and not impose a monetary penalty").

Here, the PFCRA subjects a person administratively liable to a maximum civil penalty amount per claim, a maximum assessment amount of not more than twice the claimed amount for each false and fraudulent claim in lieu of damages sustained by the United States, and any other remedy that may be prescribed by law. 31 U.S.C. § 3802(a)(1). Furthermore, an ALJ

considers the factors in the PFCRA to determine *how much* of a monetary award to impose pursuant to regulation. 24 C.F.R. § 28.40(b). Under the PFCRA, the award amount of both the civil penalties and assessment depends on the analysis of the factors. *Id.* ("In determining an appropriate amount of civil penalties *and* assessments, the ALJ and, upon appeal, the Secretary or designee, shall consider and state in his or her opinion any mitigating and aggravating circumstances." (emphasis added)). The PFCRA's statute ties civil penalties and assessments together and mandates their award. *See* 31 U.S.C. § 3802(a). The Court cannot award one without the other. Therefore, although the Supreme Court in *Jarkesy* only discussed a civil penalty award, *see generally Jarkesy*, 603 U.S. 109, the same analysis applies to whether any monetary award—which includes both a civil penalty and an assessment—violates the Seventh Amendment right to jury trial.

In *Jarkesy*, the Supreme Court noted that the civil penalties under the antifraud provisions increase depending on "the culpability of the defendant and the need for deterrence, *not* the size of the harm that must be remedied. Indeed, showing that a victim suffered harm is not even required to advance a defendant from one tier [of penalties] to the next." 603 U.S. at 124 (emphasis added). This is similar to the PFCRA in that the analysis of the factors under the PFCRA determines the amount awarded, not whether to impose penalties at all.

Moreover, the penalty and assessment amount imposed is dependent on the behavior of the wrongdoer. A plain reading of the regulation listing the factors under the PFCRA indicates that the monetary award is related to the harm caused and the need to deter similar acts. 24 C.F.R. § 28.40(b). As the ALJ made clear in his initial order, the regulation states, "Because of the intangible costs of fraud, the expense of investigating fraudulent conduct, and the need for deterrence, *ordinarily* twice the amount of the claim as alleged by the government, *and* a significant civil penalty, should be imposed." *Id.* (emphasis added). The regulation does not refer

to making the government whole, remedying the harm, or restoring the status quo. On the contrary, it specifically discusses how intangible harm can be from fraud and that deterrence is necessary. *Id.* Because the analysis does not turn on restoring the status quo or the victim,[11] the PFCRA's monetary award—both assessment and civil penalties—are designed to be punitive. *Jarkesy*, 603 U.S. at 124.

Third, whether the regulation includes equitable factors to consider when deciding the amount awarded is not dispositive in determining whether the PFCRA's penalties are punitive or equitable. HUD argued that the factors the ALJ considered under the PFCRA when determining the amount of assessment and civil penalties include equitable factors that a jury could not consider, indicating the remedy is not punitive in nature. (HUD's Reply 13–14, 13 n.46.) In his decision, the ALJ considered the 17 delineated factors in the PFCRA, almost all of which are legal in nature. (ALJ Dec. 18–20.) The ALJ's decision and the Secretarial Review Order—as well as a review of the PFCRA's factors—make clear that none of the factors are aimed to restore a victim or make anyone else whole. (*Id.*; Sec. Rev. Order 18–20; 24 C.F.R. § 28.40(b).) Indeed, the only factor that could be considered equitable in nature is that which addresses the respondent's ability to pay. 24 C.F.R. § 24.80(b)(17). The remaining factors, as the ALJ and Secretarial Designee addressed, are aimed to address "the intangible costs of fraud, the expense of investigating fraudulent conduct, and the need for deterrence." (ALJ Dec. 18; Sec. Rev. Order 18.) The primary focus of the ALJ's analysis of the factors is on Smith's conduct and emphasizes the significant "need to deter similar misconduct." (ALJ Dec. 18–20.) These factors

---

[11] HUD argued that the judgment sought in this case "would not fully reimburse the government for the money improperly obtained and the costs of recovery . . . making the remedy here remedial and equitable, not punitive or legal." (HUD's Reply at 13–14.) This is irrelevant because the regulation does not discuss compensation for victims or costs incurred by the government; rather, it discusses that harm from fraudulent acts is intangible and the need to deter any such future behavior. 24 C.F.R. § 28.40(b).

are not designed to make anyone whole from the harm, and here, none of Smith's and Wong's tenants were denied their rental units in exchange for the Section 8 HAP payments. Instead, these factors were specifically relied upon by the ALJ to justify the assessments and penalties imposed to deter future conduct and address the intangible costs of fraud, including the expense of investigating fraudulent conduct. For these reasons, the Court finds that the PFCRA's remedy is legal, not equitable, in nature.

Furthermore, there is a close relationship between the PFCRA and common law fraud as "[b]oth target the same basic conduct: misrepresenting or concealing material facts." *Jarkesy*, 603 U.S. at 125; *compare* 31 U.S.C. § 3802(a) (PFCRA) *with* Restatement (Third) of Torts: Liability for Economic Harm, §§ 9, 13 (2018). HUD's argument that the PFCRA and common law fraud are not closely related to each other ignores *Jarkesy*'s acknowledgment that the causes of action do not have to be identical to find they are closely related. (HUD's Reply 14.) *Jarkesy* 603 U.S. at 125–26. The PFCRA uses terms of art similar to common law fraud, which "is no accident." *Jarkesy*, 603 U.S at 125. For example, the PFCRA uses the word fraud, requires that the fraud be material, and that the fraud cause economic harm. *See* 31 U.S.C. § 3801(a); *see also* Restatement (Third) of Torts: Liability for Economic Harm, §§ 9, 13. However, the PFCRA and common law fraud are by no means identical to each other. For example, as stated by HUD, the PFCRA addresses federal contracting and payment and is thus far narrower than common law fraud. (HUD's Reply 14.) The burden of proof is different under the PFCRA than it is under common law fraud. (*Id.*) There are specific elements under the PFCRA not present under common law fraud. (*Id.*)

Such differences do not mean that there is not a close relationship between the two, as is acknowledged and addressed in *Jarkesy*. 603 U.S. at 126. There, the Supreme Court acknowledged that federal securities law imposes a different burden of proof, targets only certain

subject matter, and does not require a showing of harm to be actionable. *Id.* Despite these differences, the Supreme Court concluded that the close relationship "confirms that this action is legal in nature." *Id.* (internal quotations omitted). The PFCRA and common law fraud are not so starkly different as HUD asserts. Rather, the differences are what can be expected when a statute addresses a specific area of law but still carrying over common law concepts. The differences between the PFCRA and common law fraud are akin to the differences the Supreme Court points out in *Jarkesy*. *See id.* Therefore, the Court finds that a close relationship exists between the PFCRA and common law fraud.

Considering the above—that the statute's imposition of assessment and civil penalties is not permissive but mandatory once liability is determined; that the factors considered turn on Smith's culpability; that the award was to deter others; and that the PFCRA and common law fraud are closely related—the Court finds that the claims lodged against Smith under the PFCRA are legal in nature, which triggers the right to a jury trial under the Seventh Amendment.

**c. The public rights exception to the Seventh Amendment does not apply.**

HUD argues that even if the Seventh Amendment right to a jury trial is triggered under the PFCRA, the public rights exception should apply. (HUD's Reply 14–15.) In making this argument, HUD relies on language in *Jarkesy* identifying historic categories that fall within the public rights exception. (*Id.* at 14 (citing *Jarkesy*, 603 U.S. at 130 (collecting cases identifying the government's right to collect revenue; Congress' power over foreign commerce; the President's right to impose tariffs on goods imported by unfair methods of competition; relations with Indian tribes; the administration of public lands; and the granting of public benefits such as payments to veterans, pensions, and patent rights)).) In *Jarkesy*, the Supreme Court emphasized that "we do not consider congress can . . . withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." 603 U.S. at 132 (alteration in original)

(citing *Murray's Lessee v. Hoboken Land Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)). Therefore, what is critical is "the substance of the suit." *Id.* at 133. When a statute can "trace [its] ancestry to the common law," the public rights exception will not apply because Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be taken to an administrative tribunal." *Id.* at 135, 137 (alteration and internal quotation marks omitted).

Here, as discussed above, the PFCRA's substance can be traced to common law fraud and is legal in nature considering the penalties are punitive and the close relationship between the PFCRA and common law fraud. Even though the PFCRA is, ostensibly, a "newly fashioned regulatory scheme," *see Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989), the substance of the action is still a traditional legal claim. As such, it cannot be removed from an Article III court merely because Congress has assigned it to an administrative tribunal. *Jarkesy*, 603 U.S. at 135. Moreover, the public rights exception is just that—an *exception*—and there is a presumption in favor of adjudication in an Article III court. *Millennia*, 783 F. Supp. 3d at 1068. Based on a review of the statute, the record, and the facts as applied to Smith, there is nothing in the record to overcome the presumption that this action concerns a private right. Therefore, the public rights exception does not apply and Smith has a Seventh Amendment right to a jury trial under the PFCRA. Accordingly, the Court finds the PFCRA's civil penalty and assessment provisions unconstitutional as they violate the Seventh Amendment rights of any respondent. As such the Court need not address Smith's constitutional arguments under the Fifth and Eighth Amendments. (*See* Smith's MSJ 20, 22; HUD's MSJ 25–29.)

## VI. CONCLUSION

For the foregoing reasons, the Court grants partial summary judgment in favor of HUD on the following issues: (1) the Court does not have jurisdiction to consider the PFCRA's statutory cap amount; (2) there is substantial evidence supporting the ALJ's and Secretarial

Designee's finding that Smith was a covered individual under the HAP contracts' conflict of interest language; and (3) substantial evidence supports the ALJ's and Secretarial Designee's finding that Smith's misrepresentations about his conflict of interest were material to the false claims.

Despite these findings in favor of HUD, the Court is nonetheless constrained to grant Smith's motion for summary judgment on the ground that under *Jarkesy*, the PFCRA's remedy of imposing civil penalties and assessments are legal, not equitable, in nature, and that the ALJ's award of $735,372 deprived Smith of his Seventh Amendment right to a jury trial. As the Supreme Court noted,

> [a] defendant facing a fraud suit has the right to be tried by a jury of his peers before a neutral adjudicator. Rather than recognize that right, the dissent would permit Congress to concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch. That is the very opposite of the separation of powers that the Constitution demands.

*Jarkesy*, 603 U.S. at 140. Accordingly, the Court grants Smith's Petition, vacates the administrative orders below, and directs the Clerk to enter judgment in favor of Smith forthwith and to close the case.

IT IS SO ORDERED this 29th day of October, 2026.

RAMONA V. MANGLONA
District Judge